Filed 11/24/15  In re E.M. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re E.M., A Person Coming Under the Juvenile Court Law. | B261051 |
| | (Los Angeles County Super. Ct. No. CK96120) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| T.F., | |
| Defendant and Respondent; | |
| POLLY D., | |
| Objector and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Timothy R. Saito, Judge.  Affirmed.

Deborah Dentler for Objector and Appellant.

Margaret Coyne and Janet G. Sherwood for Advokids as Amicus Curiae on behalf of Objector and Appellant.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Respondent.

No Appearance for Plaintiff and Respondent.

Suzanne M. Davidson, under appointment by the Court of Appeal, for Minor.

## INTRODUCTION

This is a troubling case. E.M. was removed from her parents, who were long term drug users, by the Department of Children and Family Services (DCFS) in October 2012, when she was barely a year old. As a result of repeated delays and continuances, as well as an erroneous grant of family reunification services to T.F. (mother) fourteen months after E.M. was removed from her care, E.M. remained in the foster care system for more than two years. During this time, E.M. was placed with, and bonded to, two different parental figures, including de facto parent Polly D., with whom she lived for over a year. Ultimately, after mother enrolled in an inpatient drug rehabilitation program and remained drug-free for five months, E.M. was removed from Polly and returned to mother just before her third birthday. Polly appeals from E.M.'s return to mother and from the termination of her de facto parent status.

We applaud mother's apparently successful efforts to conquer her drug addiction and control her bipolar disorder, but we are disturbed that a very young child was denied permanency during the lengthy period that preceded such efforts. E.M. was well under three years old when these dependency proceedings commenced, and she had the right to permanency within the statutorily prescribed time period—generally, within six months for a child under three years. Instead, E.M. remained in limbo in the foster care system for more than two years before being returned to a mother she barely knew.

Nonetheless, as we discuss in the body of this opinion, although we agree with Polly that significant errors were made in this case, we conclude that those errors are not remediable by this appeal. Polly urges that the juvenile court abused its discretion in two separate ways—by granting mother six months of reunification services in December 2013, and by ordering E.M. returned to mother in October 2014. As to the first issue, although we agree with Polly that the December 2013 order of reunification services was erroneous, that order was not timely appealed and is not subject to reversal in this appeal from subsequent orders. As to the second issue, substantial evidence supported the juvenile court's findings, and thus the order returning E.M. to mother was

2

not an abuse of the court's broad discretion.  Accordingly, notwithstanding clear errors in this case, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother and Robert M. (father) are the parents of E.M., born October 2011. Appellant Polly D. was E.M.'s foster mother from September 2013 to October 2014, and had de facto parent status from February 2014 to December 2014.

### I.

### Detention and Petition

The family came to the attention of DCFS following mother's arrest in August 2012, when E.M. was ten months old.  Mother admitted she had been diagnosed with bipolar disorder and had a substance abuse problem.  She arranged for E.M. to be cared for by her estranged husband, Jose F., who had primary custody of E.M.'s half-sister.

In September 2012, mother and father agreed to voluntary family reunification services, including drug testing and rehabilitation.  Subsequently, however, father tested positive for methamphetamines and cannabinoids and failed to maintain contact with DCFS.  Mother had two unexcused "no show" drug tests, tested positive for methamphetamines on October 17, 2012, and admitted that she used methamphetamines every weekend.  DCFS thus recommended that E.M. be placed with Jose under court supervision.

DCFS filed a juvenile dependency petition on behalf of E.M. on October 25, 2012. It alleged:  (b-1) mother had a history of substance abuse and was a current user of amphetamines and methamphetamines; (b-2) father had a history of substance abuse and was a current user of amphetamines, methamphetamines, and marijuana; (b-3) mother possessed illegal drug pipes in the child's home and was arrested for possessing drug paraphernalia on August 21, 2012; and (b-4) mother had a history of mental and

emotional problems, including a diagnosis of bipolar disorder, and had failed to regularly take her psychotropic medication.[1]

On October 25, 2012, the juvenile court found a prima facie case for detaining E.M. Mother was granted monitored visitation three times per week.

## II.

## Adjudication

The jurisdiction/disposition report, dated December 12, 2012, said mother's family reported that mother began using street drugs as a teenager, and had abused prescription drugs as an adult. Mother had completed an outpatient substance abuse program two years earlier through the criminal court, but had subsequently admitted to returning to methamphetamine use. Mother had been diagnosed with bipolar disorder four or five years earlier and had inconsistently taken psychotropic medication to control the symptoms.

DCFS was unable to locate mother or father. A children's social worker (CSW) attempted to speak with mother and father at their last known addresses, but they were no longer living at either location. A due diligence search for mother was unsuccessful, and neither mother nor father appeared at the December 14, 2012 hearing. The case was set for adjudication on January 4, 2013.

In a "Last Minute Information for the Court," DCFS recommended that the petition be sustained, no family reunification services be offered to mother or father

---

[1] An additional allegation, that mother and father allowed substance abusers to frequent their home and have unlimited access to E.M., was not sustained by the juvenile court.

because their whereabouts were unknown (Welf. & Inst. Code, § 361.5, subd. (b)(1))[2], and a hearing be set pursuant to section 366.26.

On January 4, 2013, the juvenile court sustained paragraphs b-1, b-2, b-3, and b-4 of the petition. It continued the disposition hearing for one month to allow DCFS to perfect service on father.

### III.

### Disposition

In a Last Minute Information for the Court, DCFS advised that it had completed a due diligence search for father and provided notice to him. It again recommended no family reunification services for mother or father.

The court found that notice of the proceedings had not been properly served on father, and it continued the disposition hearing from February to March. The court subsequently continued the matter to April, apparently because it concluded that DCFS still had not properly served notice on father.

At the disposition hearing held April 12, 2013, the juvenile court found pursuant to section 361, subdivision (b) that substantial danger existed to E.M.'s physical health, there were no reasonable means to protect her without removing her from parents' custody, and DCFS had made reasonable efforts to enable E.M. to return home. The court ordered that no family reunification services be provided to mother or father pursuant to section 361.5, subdivision (b)(1), and it set a section 366.26 hearing for August 9, 2013.

---

[2] Section 361.5, subdivision (b)(1) provides: "(b) Reunification services need not be provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence, any of the following: [¶] (1) That the whereabouts of the parent or guardian is unknown."

All subsequent statutory references are to the Welfare and Institutions Code.

5

## IV.

## The Section 366.26 Report

DCFS initiated a due diligence search for mother in May 2013 by mailing notices to her at six different addresses. The notice mailed to an address in Garden Grove was marked "delivered," and on July 17, 2013, mother contacted the CSW to say she had received it. Mother said she was homeless, but a friend allowed her to receive mail at the Garden Grove address. Mother provided the CSW with a temporary phone number and email address, and she acknowledged by email the August 9, 2013 date of the section 366.26 hearing.

DCFS filed a section 366.26 report dated August 9, 2013. It said mother had called E.M. periodically in May and had visited her three times in July and August. E.M. reportedly had adjusted well to her placement with Jose and demonstrated a strong attachment to him and his daughter. Jose was interested in adopting E.M., but he was experiencing medical issues and he thus asked that the adoption process be halted.

On August 9, 2013, mother did not appear at the section 366.26 hearing. The court found that notice to the parents was not proper and continued the section 366.26 hearing to December.

## V.

## E.M.'s Placement with Polly D.

In August 2013, Jose became ill and could no longer care for E.M. He declined visitation, saying it would be too hard for him and his daughter.

E.M. was placed with Polly in September 2013. Polly expressed interest in adopting E.M., and E.M. was reported to be thriving in Polly's home: "The child [E.M.]'s development has considerably improved in [Polly's] home. [E.M.] previously exhibited hyperactive behaviors such as consistent climbing on furniture, running throughout the home yelling and screaming. Currently her behaviors have decreased due to the caregiver's ability to redirect the child. The caregiver reports that [E.M.]'s diet also has improved and her weight has decreased closer to her developmental age." DCFS recommended that E.M. be released for adoption.

6

On September 16, 2013, DCFS advised the court that the CSW met with mother on August 30, 2013 at mother's temporary residence. Mother said "she was packing all of her belongings as she had to move and had no where to go. . . . On July 17 the [CSW] had emailed several drug rehabilitation programs in the Orange County area. When asked if she had called any of the programs, the mother stated she had not called all the programs on the list . . . . The mother stated she would like Family Reunification Services reinstated as she would like another opportunity to reunify with [E.M.]. [¶] The mother was noticed for the next [366].26 hearing set on 12/06/13. The mother was asked why she failed to appear at the prior [366].26 hearing that was set on 08/09/13. The mother stated she did not appear because she was afraid that she would be arrested as she has an outstanding warrant. The mother was encouraged to address any current legal issues as this will pose a problem should the court grant her family reunification[] again. The mother was also encouraged to attend the next [366].26 hearing set on 12/06/13. . . . The [CSW] had provided additional referrals for substance abuse programs in the San Gabriel Valley in the event she returned back to the area."

The court held a six month review hearing on October 11, 2013, at which mother did not appear. The juvenile court found that returning E.M. to her parents would create a substantial risk of detriment to her physical or emotional well-being, DCFS had complied with the case plan, a permanent plan of adoption was appropriate, and the likely date by which DCFS would finalize the permanent plan was April 11, 2014. A section 366.26 hearing was set for December 6, 2013.

Polly filed a Request for Prospective Adoptive Parent Designation on October 11, 2013, and filed a De Facto Parent Request on November 19, 2013.

## VI.

### Mother's Appearance at the December 6, 2013 Hearing and the
### Juvenile Court's Grant of Reunification Services to Mother

At the December 6, 2013 hearing, DCFS advised the court that mother had been located and had requested reunification services. DCFS therefore asked that the section 366.26 hearing be taken off calendar and the case set for a review hearing on

7

April 25, 2014. Mother's counsel requested that the hearing be set in June, to allow mother to receive a full six months of family reunification services.

The court ordered mother to participate in a drug rehabilitation program with on-demand testing, attend a parenting class, participate in mental health counseling, submit to a psychological assessment, take all prescribed psychotropic medication, and attend individual counseling to address case issues. Mother was granted monitored visitation with E.M. three times per week. A further hearing was set for June 6, 2014.

On February 27, 2014, the juvenile court granted Polly's request for de facto parent status.

## VII.

### June 2014 Status Hearing

The June 6, 2014 status review report said mother had given birth prematurely to her third child on April 20, 2014. The baby tested negative for drugs at birth, but a meconium test was positive for amphetamines/methamphetamines and marijuana.[3] Mother admitted using methamphetamines and said she had not taken prescribed psychotropic medication since 2012.

Mother entered Heritage House, an in-patient drug rehabilitation center for mothers and their children, on May 7, 2014, and was reported to be doing well. In May, mother and E.M. had four monitored visits at DCFS's office. The DCFS monitor reported that mother was appropriate with E.M. and that all four visits went very well. Polly reported, however, that E.M. had become very clingy and was expressing fear that Polly would leave her or that she would be taken away.

---

[3] Meconium analysis "is currently considered the best method for detecting drug exposure in pregnancy. It provides a wider window of detection of gestational exposure, presumably as remote as the second trimester, when drugs begin to accumulate in meconium (by direct deposition from the biliary tree or when the fetus ingests amniotic fluid). [¶] Meconium analysis is reliable for detecting opioid and cocaine exposure after the first trimester and can be used to detect a range of other illicit and prescribed medications." (<http://emedicine.medscape.com/article/978763-workup> [as of Nov. 20, 2015].)

8

DCFS assessed that the risk of abuse and neglect was high if E.M. were returned to mother. It noted that mother had no contact with E.M. until recently and had continued to use illegal substances. DCFS therefore recommended that mother's reunification services be terminated.

At the June 6, 2014 hearing, mother's counsel opposed termination of mother's services and requested a contested hearing. The court set a hearing for September 9, 2014.

## VIII.

## September 2014 Hearing

The court held a contested status review hearing on September 9, 12, and 15, 2014. The court heard testimony from mother's therapist and substance abuse counselor that mother was doing extraordinarily well at Heritage House. Mother had been taking psychotropic medication for about a month and was regularly attending AA or NA meetings. Her drug tests were consistently negative. She was developing good coping and parenting skills.

Mother testified that she was committed to staying sober and regaining custody of her children. She acknowledged that she had been diagnosed with bipolar disorder and said she had been taking lithium and seroquel for about one month. She said she understood it was important for her to maintain her mental health treatment because she otherwise was at risk of self-medicating. She believed E.M. was ready to be returned to her because "I believe that over the last five months, the intense work that I've done and all the things that I have learned have . . . just changed the core of who I am. [¶] Where I'm at right now is designed for reunification. I've seen . . . plenty of other girls with their kids. And the counselor is there, the therapist is there, and the program aides. They're all trained to help with that transition. [¶] Because no matter how you do it, it's going to be hard. It's going to be hard on the child. And they're there to help support you and to guide you and also your child. Not just me but [E.M.]." Mother said she believed the court should return E.M. to her "[b]ecause now I can provide her with a very

9

safe, stable, healthy, nurturing home. Home and mother. I'm also safe and healthy and stable and nurturing for her."

E.M.'s therapist testified that E.M. was experiencing a lot of anxiety. She was having trouble sleeping and separating from Polly. She was "constantly looking for [Polly] and calling for her," and had begun urinating in her pants. She said things to Polly like, "Are you going to keep me? Am I going anywhere?"

The CSW testified that mother was in partial compliance with her case plan because she had been drug testing only since April and receiving mental health services only since August. She said the visits between mother and E.M. were positive, but she believed there would be a substantial risk of harm if E.M. were returned to mother because "[mother's] just recently, within the last five months, . . . gotten clean. . . . She's in her infancy stages of recovery. That is a big deal, especially when you just had a child a couple months ago with a positive toxicology." The CSW noted that mother had not acted as a parent for some time, and that parenting an active child like E.M. could trigger a relapse. The CSW said she would like to see mother maintain her sobriety for at least a year before E.M. was returned to her, and she recommended that visits between mother and E.M. remain monitored "to ensure that [E.M.] is adjusting well when she's with her mother."

At the conclusion of testimony, counsel for DCFS urged that mother's reunification services be terminated and a section 366.26 hearing be set. While DCFS's counsel acknowledged that mother had made significant progress in treating her mental health and substance abuse issues, he noted that she had been clean for only five months and had been taking medication for her bipolar disorder for only one month. As a result, "there is simply not enough time under her belt for us to have any confidence that [mother] will maintain her sobriety, [that] she will maintain her mental health. And for all of those reasons, it is simply premature to consider release of [E.M.]."

Mother's counsel urged that E.M. should be immediately returned to mother. Counsel for E.M. and for father joined in mother's counsel's argument.

10

The court acknowledged that this was a very difficult case. It noted that mother had a long history of drug addiction, that mother was now in substantial compliance with her case plan, and that Polly had done a very good job of meeting E.M.'s needs. The issue, therefore, was whether mother's compliance was of sufficient duration to give the court confidence that she was not likely to relapse. As to that issue, the court made the following observations:

"[Mother's] indicated, at least to the court that from what I heard, she has shown insight with regards to her issues. . . . The one statement that struck the court very seriously was the fact that she indicated that the reason why she wants to stay [in] her mental health treatment program was because if she doesn't do that, she begins to self-medicate. And when she starts to medicate, that leads to drug usage. [¶] To the court, it appears that mother has recognized the issues that are important for her to address in this case as well as the fact that she does have [a] support system behind her to try to address the issues. She's been appropriate during visits. . . .

"But given the fact that even the social worker in this case has indicated that there's interaction and bonding with the mother and the child recently and that the visitations have been going well, therapist also indicating that some of the stress with regards to the relationship could be alleviated if they were at the Heritage House, and the fact that there are several individuals and therapists and various players at the Heritage House that would be able to further assist mother in caring for the child, [the] court at this point can't find a substantial risk of detriment to not return at this time."

The court therefore found that return of E.M. to mother would not create a substantial risk of detriment, and it ordered her returned home to mother on the condition that mother continue to reside at Heritage House and participate in a transition plan. The court stayed immediate return of E.M. until it received further information about a transition plan, but ordered that E.M. was to have unmonitored overnight visits with mother.

## IX.

### E.M.'s Return to Mother; Polly's Section 388 Petition;
### Termination of Polly's De Facto Parent Status

On October 17, 2014, mother was accepted into the Heritage House Cottages program. E.M. was released to mother the same day. DCFS requested that the case be transferred to Orange County Social Services, through which mother and her infant son were receiving services.

On October 23, 2014, Polly filed a section 388 petition requesting that E.M.'s return to mother be stayed or that she be permitted visits and phone calls with Polly. Mother filed her own section 388 petition, requesting that Polly's de facto parent status be terminated. The court ordered a hearing on both petitions. On the same day, the court formally lifted the stay on E.M.'s return to mother.

On December 4, the court granted mother's section 388 petition, terminated Polly's de facto parent status, ruled that Polly's section 388 petition was therefore moot, and ordered the case transferred to Orange County juvenile court.

On November 5, 2014, Polly appealed from the findings and orders made at the September 15 and October 23, 2014 hearings. On December 8, 2014, Polly filed a further appeal from the orders of October 23 and December 4, 2014.[4]

### CONTENTIONS

Polly contends that that the juvenile court erred in granting mother six months of reunification services in December 2013 and continuing the case to an 18-month review hearing. Polly further contends that substantial evidence did not support the juvenile court's conclusion that mother had made significant and consistent progress towards completing her reunification plan, and therefore that the trial court erred in releasing E.M. to mother in October 2014.

---

[4] The December 8 notice of appeal also purported to appeal from an October 29, 2014 "letter from presiding judge of juvenile court re: request for disclosure under WIC section 827." That letter is not part of our appellate record.

DCFS declined to file a brief in this case, and thus the only respondents to participate in this appeal are mother and E.M. They contend that because Polly did not appeal from the December 6, 2013 order granting reunification services and setting an 18-month hearing, she is precluded from raising the issue in this appeal; on the merits, they urge that the juvenile court properly ordered reunification services for mother once her whereabouts became known. They further contend that substantial evidence supported the juvenile court's findings that mother substantially complied with the case plan and that it was not detrimental to return E.M. to mother's care.

Amicus curiae Advokids[5] contends that the juvenile court lacked authority to extend reunification services beyond December 2013, which was 12 months from the date E.M. entered foster care. Advokids urges that by extending mother's reunification services and ultimately returning E.M. to mother, the court "violated a comprehensive statutory scheme and . . . public policy, which requires the court to make the welfare and protection of the child its paramount concern."

## DISCUSSION

### I.

**The Juvenile Court Abused Its Discretion by Granting Mother**
**Reunification Services in December 2013, but the Error Cannot**
**Be Rectified in This Appeal from Subsequent Orders**

Polly contends that the juvenile court abused its discretion when, in December 2013, it granted mother reunification services and set an 18-month review hearing. Mother and E.M. disagree on the merits; they also contend that Polly's challenges to the December 2013 orders are untimely.

As we now discuss, the juvenile court abused its discretion by granting mother six months of family reunification services and setting an 18-month review hearing in

---

[5] Advokids describes itself as an "Internal Revenue Code section 501(c)(3) nonprofit organization that advocates for the right of every child in the California dependency system to safety, security, stability, and timely permanency as required by law." The court accepted Advokids's amicus curiae brief for filing on July 1, 2015.

December 2013, more than a year after E.M. was removed from mother's custody. However, because an appeal from that order was not timely filed, it is not now subject to reversal.[6]

### A. The Order Granting Mother Reunification Services Was an Abuse of Discretion

Family reunification services generally are offered to a parent whose child is declared a juvenile court dependent. In the case of a child who is less than three years old at detention, reunification services typically are offered "for a period of six months from the dispositional hearing as provided in subdivision (e) of Section 366.21, *but no longer than 12 months* from the date the child entered foster care." (§ 361.5, subd. (a)(1)(B), italics added; see also Cal. Rules of Court, rule 5.695(h)(1).)

An exception to the general preference for offering parents reunification services is provided in section 361.5, subdivision (b)(1), which says that reunification services need not be provided to a parent "when the court finds, by clear and convincing evidence . . . [¶] [t]hat the whereabouts of the parent or guardian is unknown. . . ." Here, mother's whereabouts were unknown as of the April 12, 2013 disposition hearing, and thus the juvenile court properly declined to offer mother reunification services.

Mother contends that although the juvenile court was not required to offer her reunification services in April 2013, it *was* required to offer her such services in December 2013 because "DCFS's contact with [mother] during the six-month period after the disposition triggered [mother's] right to family reunification services under section 361.5, subdivision (d), as well as DCFS's obligation to seek a modification of the prior order denying reunification services." We do not agree. Section 361.5, subdivision (d), provides that if reunification services are not ordered pursuant to subdivision (b)(1) and the whereabouts of a parent "become known *within six months of*

---

[6] Although we ultimately conclude there was no timely appeal of this issue, because of the importance of the statutorily prescribed time periods to the well-being of young children, we address on the merits the issue of the grant of family reunification services to mother.

14

*the out-of-home placement of the child*," the court "shall order the social worker to provide family reunification services." (Italics added.) Here, E.M. was placed out of mother's home on October 25, 2012, and thus mother was entitled to services under section 361.5, subdivision (d) only if her whereabouts became known within six months—i.e., on or before April 25, 2013. (See *In re Jonathan P.* (2014) 226 Cal.App.4th 1240, 1258, fn. 13 ["The 'six month' period in section 361.5, subdivision (d) commences when the minor is removed from the custodial parent and placed out of the custodial home."].) By mother's own admission, she did not have any contact with DCFS until July 2013, a full eight months after E.M. was placed out of her home. Accordingly, she was not entitled to services under section 361.5, subdivision (d).

Although the court was not required under section 361.5, subdivision (d) to offer mother services in December 2013, it had discretion to do so under section 361.5, subdivision (a)(1)(B), which provides: "For a child who, on the date of initial removal from the physical custody of his or her parent or guardian, was under three years of age, court-ordered services shall be provided for a period of six months from the dispositional hearing as provided in subdivision (e) of Section 366.21, but no longer than 12 months from the date the child entered foster care as provided in Section 361.49 unless the child is returned to the home of the parent or guardian." Under this section, the court thus had discretion to offer mother services, but only until "12 months from the date [E.M.] entered foster care as provided in Section 361.49." (§ 361.5, subd. (a)(1)(B).) Pursuant to section 361.49, E.M. was "deemed to have entered foster care" on December 24, 2012,[7] and thus reunification services should not have been provided beyond

---

[7]     Pursuant to section 361.49, a child "shall be deemed to have entered foster care on the earlier of the date of the jurisdictional hearing . . . or the date that is 60 days after the date on which the child was initially removed from the physical custody of his or her parent or guardian." Here, E.M. was initially removed from mother on October 25, 2012 and the jurisdiction hearing was held on January 4, 2013. Thus, E.M. is "deemed to have entered foster care" sixty days after her removal from mother's custody—i.e., on December 24, 2012.

December 24, 2013—approximately three weeks after the hearing at which they were ordered.

Section 366.21, subdivision (g) gives juvenile courts discretion to provide services to parents after 12 months, but only under limited circumstances not present here. That section provides that at the permanency hearing held no later than 12 months after the date the child entered foster care, if the child is not returned to the parent, the court may continue the case for up to six months, provided that the continued hearing shall occur "within 18 months of the date the child was originally taken from the physical custody of his or her parent or legal guardian." (§ 366.21, subd. (g)(1).) However, the court shall continue the case "*only* if it finds that there is a substantial probability that the child will be returned to the physical custody of his or her parent or legal guardian and safely maintained in the home within the extended period of time or that reasonable services have not been provided to the parent or legal guardian." (*Ibid.*, italics added.) For the purposes of this section, in order to find a substantial probability that the child will be returned to the physical custody of his or her parent or legal guardian and safely maintained in the home within the extended period of time, the court is required to find (1) "[t]hat the parent or legal guardian has consistently and regularly contacted and visited with the child," (2) "[t]hat the parent or legal guardian has made significant progress in resolving problems that led to the child's removal from the home," *and* "[t]he parent or legal guardian has demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (§ 366.21, subd. (g)(1)(A)-(C).)

In the present case, had a review hearing been held on or before December 24, 2013 for the purpose of determining whether extended services should be provided under section 366.21, subdivision (g), the juvenile court could not reasonably have found that any of the section 366.21, subdivision (g)(1) factors had been met: Mother had not consistently and regularly contacted and visited E.M., made significant progress in resolving her substance abuse and psychiatric problems, or demonstrated the capacity and ability to complete the objectives of her treatment plan and to provide for E.M.

16

Therefore, the juvenile court abused its discretion in offering services to mother beyond December 24, 2013.

        *B.      The Error Is Not Reversible in This Appeal from Subsequent Orders*

Although the order granting reunification services was erroneous, the error cannot be rectified in this appeal from subsequent orders. Section 395 provides in relevant part: "A judgment in a proceeding under Section 300 may be appealed in the same manner as any final judgment, and any subsequent order may be appealed as an order after judgment. . . ." " ' A consequence of section 395 is that an unappealed disposition or postdisposition order is final and binding and may not be attacked on an appeal from a later appealable order.' (*In re Jesse W.* (2001) 93 Cal.App.4th 349, 355.) An appeal from the most recent order in a dependency matter may not challenge earlier orders for which the time for filing an appeal has passed. (*Ibid.*) 'Permitting a parent to raise issues going to the validity of a final earlier appealable order would directly undermine dominant concerns of finality and reasonable expedition,' including 'the predominant interest of the child and state. . . .' (*In re Janee J.* (1999) 74 Cal.App.4th 198, 207.) Accordingly, 'By failing to appeal, [a party waives] any complaint she may have regarding the [reunification] plan as ordered.' (*In re Julie M*. (1999) 69 Cal.App.4th 41, 47.)" (*Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1018.)

Here, the juvenile court granted mother reunification services on December 6, 2013. On the same date, it set an 18-month review hearing for June 6, 2014. The December 6, 2013 order granting mother reunification services and setting a review hearing was appealable under section 395, but no appeal was taken.

The present appeal, filed November 5 and December 8, 2014, challenged findings and orders made at the hearings on September 15, October 23, October 29, and December 4, 2014. Significantly for our purposes, neither notice of appeal purported to challenge the findings and orders of December 6, 2013; even if they had specified the December 6, 2013 order, because they were filed well after the expiration of the time to appeal from the December 6, 2013 order, they would have been untimely. We therefore lack jurisdiction to review the December 6, 2013 order.

## II.

## The Juvenile Court Did Not Abuse Its Discretion by Ordering
## E.M. Released to Mother in October 2014

Polly contends that substantial evidence did not support the juvenile court's findings at the September 2014 hearing that mother had made significant and consistent progress towards completing her reunification plan, and therefore it erred in releasing E.M. to mother. Polly urges that mother lacked a stable source of income and housing, had not demonstrated any ability to care for her three children, had been clean and sober for only five months, and had begun taking psychotropic medication to control her bipolar disorder only about a month before the September hearing. In light of mother's very recent progress towards recovery, Polly urges that mother could not properly have been said to have made "significant and consistent progress."

Section 366.22, subdivision (a) describes the standard for returning a child to a parent at an 18-month review hearing. That section provides that after considering the admissible and relevant evidence, "the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment."

We review the juvenile court's determination that E.M. could safely be returned to mother for abuse of discretion, looking to whether the juvenile court exceeded the bounds of reason. (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318-319.) We will not disturb the juvenile court's ruling unless it is arbitrary, capricious, or patently absurd. (*Id*. at p. 318.) We review the factual findings on which the juvenile court's orders rest for substantial evidence. (*In re C.B*. (2010) 190 Cal.App.4th 102, 123.) "In applying the substantial evidence test, '[w]e do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts.' [Citation.] 'Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order,

18

and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion. [Citation.]' " (*Id*. at p. 127.)

Although the evidence here would have supported a finding that returning E.M. to mother would create a substantial risk of detriment to E.M.'s physical or emotional well-being, it also supported a contrary finding. The evidence before the court at the September 2014 hearing was that mother had been sober since May and had been taking prescribed psychotropic medication to control her bipolar disorder. She was regularly attending 12-step meetings and was developing good parenting and coping skills. Her therapist and drug counselor believed she was committed to remaining sober and was developing the skills necessary to do so. Further, mother was living at a drug rehabilitation facility designed to help mothers regain custody of their children. The facility would provide mother with parenting support and child care, and it would help her find employment and more permanent housing. Finally, mother and E.M. had been visiting regularly and were developing a close bond.

The evidence before the juvenile court provides sufficient support for its finding that placement with mother would not be detrimental. (See *In re Liam L.* (2015) 240 Cal.App.4th 1068, 1087-1088.) Polly invites us to reweigh the evidence of detriment, but such reweighing is inconsistent with our standard of review. (See *In re Stephanie M*., *supra*, 7 Cal.4th at pp. 318-319 [" ' "When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' "].) Accordingly, we conclude the juvenile court did not exceed the bounds of reason in concluding that returning E.M. to mother's custody would not create a substantial risk of detriment.

## DISPOSITION

The orders of September 15, October 23, October 29, and December 4, 2014 are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, P. J.


We concur:


ALDRICH, J.


LAVIN, J.